MARTHA S., Appellant

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

William S., Appellant

v.

State of Alaska, Department of Health & Social Services, Office of Children's Services, Appellee.

Nos. S–14049, S–14072.

Supreme Court of Alaska.

Jan. 13, 2012.

Rehearing Denied Feb. 22, 2012.

Christi A. Pavia, Pavia Law Office LLC, M.S. Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for appellants.

W.S. Laura Fox, Assistant Attorney General, Anchorage, and John J. Burns, Attor-

ney General, Juneau, for appellee State of Alaska.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Martha and William are the parents of six children. They appeal the superior court's order adjudicating their two youngest children as children in need of aid and placing the children in the custody of the Office of Children's Services (OCS). Martha and William argue that the superior court abused its discretion in making various evidentiary rulings and contend that it was clearly erroneous for the superior court to find that the children were in need of aid and that continued custody by the parents would be contrary to the children's best interests. We affirm the superior court's decision to adjudicate the children as in need of aid and to keep them in the custody of OCS for a period not to exceed 18 months.

## II. FACTS AND PROCEEDINGS

### A. Facts Leading To OCS Custody Of Andy And Allie

Martha and William are the parents of Andy and Allie.[1] Andy is twelve years old and Allie is eight. Both Andy and Allie are Indian children within the meaning of the Indian Child Welfare Act (ICWA).[2] Martha and William also have four older children: Rachel, Willie, Aaron, and Charlie. At the time this case was initiated in October 2009, Martha and William had briefly separated, but they have since reconciled. The family resides in Fairbanks.

The family has a long history with OCS. The first report of harm regarding the family occurred in 1991 when the eldest child was only a toddler. Since then, OCS has received numerous reports of domestic violence, sexual abuse, and physical abuse, some of which have been substantiated. In February 2005 Rachel and Willie were adjudicated as children in need of aid. The superior court found that Rachel was a child in need of aid under AS 47.10.011(8) (mental injury as a result of conduct by or conditions created by the parent) because of William's verbal abuse. It found that Willie was a child in need of aid under AS 47.10.011(6) (substantial physical harm as a result of conduct by or conditions created by the parent) as a result of William beating Willie after Willie was charged with burglary. But the superior court ultimately determined that Rachel and Willie could remain in their parents' home.

All four older children have a history of serious problems. Rachel became pregnant at age 16 and now has three children who are in OCS custody. In 2004 the Division of Juvenile Justice (DJJ) filed a petition to adjudicate Willie as a juvenile delinquent after he was accused of sexually assaulting two mentally disabled boys at the Boys and Girls Club, and Willie received one year of probation. In 2008 Aaron was also adjudicated a delinquent minor after admitting two separate allegations of fourth degree assault, one against another child and one against William. According to his elementary school principal, Charlie had the least difficulty of the four older children, but he was suspended from school at least once.

William admits that as a result of his contact with OCS, he distrusts and feels "defiant" toward OCS and that he and Martha have instructed their children not to talk to OCS about the family. In an August 2005 abuse history evaluation at the LEAP Alternatives to Violence Programs in Fairbanks, William stated that he had been at "war" with OCS "for the past 14 years" and admitted that he had threatened to shoot OCS caseworkers who came to his home. There are numerous reports of William cursing at

---

1. We use pseudonyms to protect the parties' privacy.

2. *See* 25 U.S.C. § 1903(4) (2006). The children are affiliated through their mother with the Na-

tive Village of Fort Yukon, also known as the Gwichyaa Zhee Gwich'in Tribe. The tribe intervened on November 30, 2009.

and threatening violence against OCS staff, often in front of his children.

Andy began experiencing behavioral difficulties at school as early as preschool and kindergarten. The principal at Andy's elementary school testified that because Andy was acting in an unsafe manner toward other children, he was placed in a program for children with behavioral and emotional problems. Martha and William believed that Andy's behavior grew worse in that program because he was surrounded by children with severe problems, and they removed Andy mid-year and home-schooled him for the rest of first grade. When Andy returned at the start of second grade, he had fallen significantly behind academically and was returned to the first grade. Andy continued to manifest behavioral problems, but his parents were opposed to testing Andy for emotional disturbance. Martha and William did work with the school in other ways. For example, if Andy was having a bad day, William would go to the school and talk to him to "try to get him back on track." But by the end of second grade, Andy's behavior had escalated to the point where he was facing expulsion, and the staff at his elementary school recommended that Andy transfer to a school that could devote more resources to his special needs.

Andy transferred, and his new teacher described his main problem as struggling "with behavioral outbursts, which consist of physical outbursts, hitting, kicking, punching, throwing objects, which is both inflicted upon himself and his peers and adults." She recognized, however, that Andy was "very intelligent" and "very compassionate and very loving," and that he expressed genuine remorse after his outbursts. Andy's teacher attributed his outbursts to his "very impulsive" nature. She also noted that in September 2009, a month after Andy started at the new school, Martha and William had agreed to have Andy tested for emotional and behavioral disturbances.

The events leading to OCS's current involvement with the family began on October 15, 2009 when Andy "tried to choke himself twice" while at school, once with a shoelace and once with a sock. Andy was nine years old at the time. Andy told his teacher "I'm gonna choke myself" and listed several feasible ways that he could kill himself. Martha and William came to the school immediately, and the principal set up what she called a "volatile student screening or threat assessment."

The written assessment noted that "Andy exhibits extreme aggressive behavior and little anger control at school" and "has a history of making threats towards others." But it also observed that Andy had a normal ability to show empathy and that his parents were easily reachable when needed and came to the school immediately when notified of the choking incident. The school's report concluded that Andy presented a "medium" level of concern and recommended creation of a "student intervention plan" that required Andy to be supervised at all times, to undergo daily checks of his backpack for potentially harmful items, and to participate in school-based counseling. The report also noted that Martha and William agreed to closely supervise Andy at home and that the counselor provided them with recommendations for out-of-school counseling options. William expressed skepticism about Andy's counselors, however, at one point referring to them as "quacks."

Around the time of Andy's choking incident on October 15, his brother Willie had been barred from all school district properties after an incident that occurred when Willie went inside Allie's elementary school. The principal found Willie in a stall of the girls' bathroom, and a young girl who was also in the bathroom alleged that Willie had tried to pull her into the stall. Despite the order barring him from all school premises, on October 16 Willie was found on school grounds at a high school and was arrested. Martha was present and was also arrested after screaming obscenities and kicking at the officers. Martha pleaded guilty to interfering with arrest, and she was also barred from all public school premises. Shortly after this incident, William left an angry voicemail laced with obscenities for the principal at Allie's elementary school. The principal reported to the school district that she feared for her safety, and William was also barred

from school district premises. Angry with the school district, on October 22 William picked Andy up from school early and said that he was going to "pull [Andy] out of school."

According to an OCS worker who called the school, school officials expressed concern that Martha and William would not "follow through" with getting Andy therapy, particularly since William said he was pulling Andy out of school. OCS also called Allie's elementary school, and the counselor there reported that she was concerned about Allie because Willie's incident in the girls' bathroom occurred when Willie was picking Allie up from school. Allie did not have any history of problems at school.

On October 23 two OCS workers went to Martha's home and told her that they had received a report about Andy and Allie and that they needed to take the children to Stevie's Place, a child advocacy center, for interviews. Because of William's history of making threats against OCS workers, Alaska State Troopers accompanied the OCS workers to the home. The OCS workers asked Martha not to tell William that they were going to Stevie's Place, but Martha did not comply with this request and called William. OCS then asked law enforcement to be present at Stevie's Place as well. When William arrived at Stevie's Place, he again threatened to kill anyone who tried to take his kids.

Both Andy and Allie were interviewed at Stevie's Place. During his interview, Andy related that he was not supposed to talk to OCS but denied that anyone had abused or hurt him. The program manager for Stevie's Place asked Andy about his attempts to harm himself at school, but Andy "was very reluctant to talk about that." The program manager also interviewed Allie. Allie was talkative and described her family, and at some point she mentioned that she had a "bad secret" with one of her brothers. When prompted about the secret, Allie said several times, "I'm not supposed to talk to you about that," but she did share that the secret had "something to do with her making [her brother] feel comfortable." The manager testified that she was concerned because Allie described it as a "bad secret." OCS

decided to take both children into emergency custody.

## B. Facts Pertaining To Andy After OCS Assumed Custody

Because of the report that Andy had tried to harm himself and because of his agitated behavior at Stevie's Place, including pounding his head and fists against the wall, the program manager for Stevie's Place recommended that Andy be taken to the emergency room for a mental health evaluation. OCS asked the police to transport Andy to the emergency room because OCS was afraid he would try to jump out of a normal vehicle. Andy's parents were not allowed to go with him to the hospital.

Based on the recommendations of the doctors at the emergency room, Andy was admitted to North Star Hospital in Anchorage on October 24, 2009. Andy's parents were not notified that he was being transferred to North Star until he was on the airplane to Anchorage. Andy told Brandy Fuesting, the OCS worker who transported Andy to North Star, that he was afraid William would kill her because William had told Andy he would kill any OCS worker who took his kids.

A psychiatrist at North Star initially diagnosed Andy with posttraumatic stress disorder (PTSD), and Andy was later also diagnosed with oppositional defiant disorder and intermittent explosive disorder. Andy's psychiatrist and clinical therapist reported that during his first weeks at North Star, Andy no longer threatened or attempted to harm himself but that he was "assaultive" and made threats towards others, including threatening to kill the staff members' families. Andy's therapist and psychiatrist also testified that Andy needed inpatient treatment at that time and would not be safe outside of a controlled environment. OCS would not permit Andy to have any contact with his parents, including on Andy's birthday. Andy's therapist testified that she thought some contact would be beneficial and that the facility usually conducted family therapy sessions twice a week.

Because North Star is a short-term, acute facility, in December 2009 Andy was trans-

ferred to the residential diagnostic and treatment unit (RDT) at Family–Centered Services of Alaska in Fairbanks. Andy's therapist there agreed with the diagnoses given to Andy at North Star. PTSD remained Andy's primary diagnosis, but the psychiatrist at RDT also diagnosed Andy with major depressive disorder. Patients usually stay at RDT for six to twelve months, and the program uses a points system that allows patients to earn more privileges as their treatment progresses.

At a status hearing in March 2010, the RDT program director testified that Andy was progressing, but that the program had not begun family therapy with Andy. OCS also decided not to allow Martha or William to participate in treatment team meetings at the facility until Andy had been there for three or four months. By the time of the adjudication hearing in August 2010, however, OCS's expert psychologist Dr. William J. van Doorninck testified that RDT had been a "treatment failure" for Andy and that RDT's model was not well-suited to him. Andy's therapist testified that Andy's outbursts of aggression made it very difficult for him to advance levels and agreed that RDT had not worked for Andy.

One week prior to the adjudication hearing, Andy returned to North Star in Anchorage. Andy's clinical therapist at North Star, Chris Yinkey, testified that Andy had returned to North Star because of physical aggression, lack of impulse control, and harm toward others displayed at RDT. Yinkey testified that North Star was an acute facility and was primarily seeking to stabilize Andy with regard to his oppositional defiant disorder and that once Andy was stabilized he should be transferred back to another long-term residential treatment program. Yinkey also testified that if Andy did not continue treatment, it was likely that he would continue to have chronic problems with aggression, depression, and anxiety and would continue to be a high risk for suicide attempts.

## C. Facts Pertaining To Allie After OCS Assumed Custody

Allie began counseling sessions with Cynthia Bridgman, a licensed clinical social work-

er at Hope Counseling Center. On October 27, 2009, after her first session with Bridgman, Allie spontaneously told Brandy Fuesting, the OCS worker who was driving her back to her foster home, that her uncle "does not touch my privates, no he doesn't." Fuesting asked Allie if anyone did, and Allie replied: "No one. No one touches my privates." Fuesting asked Allie to tell her about her family, and Allie said that there are some things she does not like about one of her brothers. Fuesting asked Allie to tell her about them, and Allie said that she watches "sex movies" with him. Allie also reported that during the movies, she and her brother "have good hugs and kisses but not bad ones, not bad ones." Allie also said that no one knows about the movies and that it was a secret. After taking Allie back to her foster home, Fuesting reported the conversation to other OCS workers and Bridgman, and they decided to interview Allie a few days later.

Allie was taken back to Stevie's Place, where she was observed by the program manager, Lori Markannen, while Fuesting interviewed her. According to Markannen, in her interviews with Fuesting, Allie "elaborated a bit about watching movies with her brother [Aaron]. At one point, she labeled them sex movies. And there wasn't a lot more than that." Markannen clarified that Allie did not explain what she meant by "a sex movie." William later testified that on some occasions he had noticed on his cable bill that his sons had ordered pornographic movies but stated that he was unaware that Allie had been exposed to them. Allie's brother Aaron testified that he had ordered pornography with his brother but maintained that he had not exposed Allie to it and that he had only ever hugged and kissed Allie in an appropriate way. Aaron described one incident where he went to help Allie use the computer and one of his brothers had left a pornographic video playing that Allie may have seen for a few seconds.

Allie continued therapy with the Hope Counseling Center's clinical social worker Cynthia Bridgman, and at the adjudication trial Bridgman testified about further disclosures made by Allie during her counseling

sessions. Bridgman qualified her testimony by pointing out that it was not her job to determine the truthfulness of Allie's disclosures, but instead that her goal was to help Allie cope with and resolve any problems she might be dealing with. One of Bridgman's main concerns was Allie's "sexual reactivity": "[W]hen a child has a sexual experience whether it be exposure or personal experience and then they act on it. They try to re-engage or engage in that . . . behavior."

Bridgman related one conversation where she was discussing boundaries and body parts with Allie after Allie had walked in on a boy using the bathroom in her foster home. Bridgman drew a penis as part of the discussion about body parts, and recounted Allie saying "that it's not supposed to be crooked, it's supposed to be straight" and explained "that she had seen her brother[s'] . . . penis[es], that she had touched [one brother's] penis while she was in [her] dad's bed and measured it with a tape measure." Bridgman said that she would categorize this as "exploration" rather than sexual abuse.

Bridgman also recounted an incident reported by Allie's foster mother where Allie and another foster child living in the house were playing in a ditch "without their pants on" and one of the girls explained that "they were playing s-e-x." Bridgman and another therapist addressed this incident in a joint session with both girls, where Allie explained "that they played s-e-x, took off their clothes, kissed and hugged, and then she demonstrated by laying on her stomach and . . . thrusting her hips. And she stated that it can hurt your belly sometimes when you do that." Bridgman classified this as an example of sexual reactivity and stated that she and the other therapist did not think there was any coercion involved on the part of either girl. Bridgman also testified that Allie's concern about having "secrets" had lessened over time and that Bridgman's goal was for Allie to feel comfortable speaking freely and not to feel burdened by secrets.

Finally, Bridgman explained that at a recent session, she had asked Allie if she thought there was anything that "she thought the judge should know." Bridgman recounted Allie's statements about "good things" and "bad things" at her various houses, at one point detailing sexual abuse:

> [Allie] said that [she] had sex at mom and dad's. At that point I asked her to tell me more about that and she said with David my neighbor. I asked her where, she said in her bedroom—in [her] bedroom with the door locked. I asked her if the clothes were on or off, she said they were off. She then added that it was his idea and it felt good. . . . I tried to be emotionless as far as not giving her affirmation or criticism but just taking the information as best as I could.

> She indicated that she also did it with her brother . . . in his and [her] dad's bed. I did not ask a lot of questions about that but she told me that he had told her to take her clothes off . . . and he laid on top of her. . . . [A]nd she said it hurt [her] insides, he's too big for [her].

Bridgman noted that these reports conflicted with Allie's earlier statements that no one had ever touched her privates. Martha and William later testified that there were no boys in the neighborhood named David and that none of the rooms in their house had locks. Bridgman concluded by explaining that sexual reactivity could cause Allie to be at greater risk for possible abuse. Bridgman thought that Allie had made good progress in therapy and did not have a substantial impairment in her ability to function, but she cautioned that Allie's ability to return home depended on her parents' abilities to address her concerns and keep her safe.

### D. Facts Pertaining To The Parents And To Services Provided By OCS

On October 26, 2009, after a court proceeding related to the family, the two OCS caseworkers who had attended the proceeding were in the parking lot of the courthouse when William revved the engine of his vehicle and then accelerated quickly in the direction of the caseworkers, "blaring" his horn. The caseworkers jumped out of the way and reported that the vehicle missed them by "an arm[']s length." Based on William's previous threats to kill any OCS caseworker who tried to take his children, the OCS caseworkers reported that they thought

he was trying to kill them. William was charged with felony assault in the third degree and ultimately pleaded guilty to and was incarcerated for misdemeanor fourth degree assault.

While William was in jail in October 2009, OCS held a team decision-making meeting in which Martha participated; William chose not to participate telephonically. William directed that all further OCS communication go through his attorney. Allie's therapist recommended against visitation and although Martha had one visit with Allie in November 2009, according to the OCS visitation supervisor, Martha did not follow guidelines for the visit. In December 2009, two months after the children had been removed, Martha and William were granted supervised visitation with the children for 30 to 60 minutes once per week. These visits took place in Martha and William's church because William had been banned from OCS premises after yelling and spitting at an OCS worker there. OCS created a case plan for the family on December 23, 2009, but Martha refused to sign it.

In February 2010 OCS arranged for the family to be evaluated by William J. van Doorninck, Ph.D., an expert in psychology from Colorado who was recommended by the Kempe Center, an organization that specializes in child protection work. Dr. van Doorninck completed his evaluation based on a records review and interviews with OCS caseworkers, Allie, Andy, the guardian ad litem, and Martha. William did not attend his scheduled appointments with Dr. van Doorninck.

In his written evaluation, Dr. van Doorninck described Allie as a "bright, engaging, socially skilled child" and noted that while "[t]o date, [Allie] has not disclosed clear evidence of being the victim of physical or sexual abuse ... [s]he does describe being subjected unwillingly to explicit sexual material." Dr. van Doorninck recommended that Allie receive "an extended period of time in psychological treatment and in a normalized family environment" and suggested that Allie could have visits with her parents up to twice a week, supervised by her therapist or a parenting coach. In his oral testimony, Dr.

van Doorninck observed that Allie had "considerabl[y] more coping skills" than Andy and was "a remarkably mature child for her age." But he also cautioned that the evidence in the record "concerning sexualized behavior" should be taken very seriously and that "her vulnerability to being sexualized and, frankly, sexually abused is a—is a real danger."

With respect to Andy, Dr. van Doorninck noted in his written evaluation that although Andy had improved with treatment from the psychological "collapse" he suffered in fall 2009, "he was insufficiently stable to return to a home setting." Dr. van Doorninck observed that "[Andy] acknowledges that he has witnessed a good deal of domestic violence against his mother and older siblings" and that "[Andy] continues to be burdened by self-defeating, distorted, and rigid judgments of himself." Dr. van Doorninck concluded:

[Andy's] psychiatric symptoms are best understood, in my opinion, as the result of multiple psychological traumas over his entire lifetime. If [Andy] were to return to his parents['] home in the near future, it is certain that he will not have the opportunity to resolve the above described issues. Extended and intensive psychosocial and behavioral treatment in a setting away from his parents' home will certainly be necessary before he can form a healthy and separate identity, a more realistic and functional view of interpersonal conflicts, and more effective and socially appropriate coping skills.

Dr. van Doorninck recommended that Andy receive "an extended period of time in residential treatment" and that he have visits with his family only once a month to allow Andy to "escape the dysfunctional patterns within his family." In his oral testimony, Dr. van Doorninck agreed that Andy's primary diagnosis was posttraumatic stress disorder.

Dr. van Doorninck conducted an independent psychological evaluation of Martha, including an interview of Martha and a review of Martha's visits with Andy and Allie. William was present at some, but not all, of the visits. Dr. van Doorninck observed that while William was present, Martha "consis-

tently defer[red]" to William and that she "interacted very little" with the children. When William was not present, Martha "emphasized her own needs." Dr. van Doorninck testified that Martha was more likely to take a "background role," and he concluded in his report that Martha is "not able to protect her children from physical, sexual, and psychological abuse," including an inability to "accept outside help for her children."

William refused to meet with Dr. van Doorninck and instead hired his own expert, Stephen Parker, Ph.D., to conduct his psychological evaluation. On March 15, 2010, Dr. Parker completed his evaluation of William. Dr. Parker observed that "[o]f all the interviews I have conducted in the last thirty years ... this one was remarkable in how impervious [William] was in his inability to understand other people's point of view." According to Dr. Parker, William "essentially attributed all of the problems with the schools, counselors, and OCS to the attitude they had or the lies they were telling." Dr. Parker also noted that William believed that "the threats to kill people were justified because he was protecting his own home."

Dr. Parker diagnosed William with major depressive disorder, mild to moderate, and personality disorder, severe, with paranoid features. Dr. Parker explained that William's personality disorder makes it "difficult for him to change his behavior.... He vigilantly interprets the behavior of people in authority in a way that fits into his preexisting framework that they are out to harm him and his family." Dr. Parker stated that this mental condition could place William's children at risk if they were returned to his custody because they suffered greater mental injuries as a result of William's behavior than as a result of the family being broken up.

Dr. Parker later submitted an evaluation of Andy as an addendum to his evaluation of William. Dr. Parker conducted two interviews with Andy. While acknowledging that he did not "doubt that [William's] intimidating, controlling and at times paranoid behavior ... has mentally injured [Andy]," Dr. Parker recommended that Andy be placed back with his family as soon as therapeutical-ly possible. Dr. Parker expressed that "[Andy] is strongly attached to his father ... [and] there is no realistic good alternative to returning him to his family that will not result in [Andy's] having severe attachment issues." Dr. Parker clarified that his opinion was "not an opinion that [OCS] has not been correct in the need for temporary placement outside the home" and that it was "in no way an endorsement of [William], his outrageous and offensive verbal behavior, his inability to put the needs of his children before his own, or his method of relating to others and parenting through intimidation."

In his oral testimony, Dr. Parker agreed that Andy had a severe emotional disturbance, likely "complex posttraumatic stress disorder," but reiterated his opinion that the mental injury suffered by Andy as a result of his removal from his family was greater than any mental injury to Andy caused by William. Dr. Parker recommended that Andy receive therapy at least twice a week; attend school outside of the home, preferably in a program designed to address his behavioral needs; and enroll in productive extracurricular activities such as sports. He also suggested that an inpatient program with "lots of family contact" could be successful, and agreed that if Andy were placed back with his family with no treatment he would be at a high risk for suicide attempts and dangerous and assaultive behavior.

In April 2010 Martha and William's visits with Allie were reduced to every other week on the recommendation of Bridgman, Allie's therapist. When a new caseworker was assigned in May 2010, Martha and William requested increased visitation, but OCS did not consult with Bridgman until August 2010. The superior court found in August 2010 that this was an abuse of discretion and ordered OCS to put together a new visitation plan for Allie, warning OCS that a failure to do so would risk a finding that the department was not making active or reasonable efforts. Martha and William's visits with Andy at RDT were increased in May 2010. When Andy was transferred back to North Star, his parents were allowed phone contact twice daily and were able to visit him in person in August 2010.

Throughout the period prior to the adjudication trial, Martha and William repeatedly expressed that they did not want to participate in OCS case plans or services other than visitation. William also testified that if Andy was returned home, he would not allow OCS to check on Andy either at home or at school. Martha testified that she would potentially allow home visits depending on the individual caseworker and whether she had notice of the visits but that she would not take parenting classes or work with a parenting coach.

## E. Proceedings After OCS Assumes Custody

On November 6, 2009, the superior court issued findings and an order extending OCS's temporary custody of Andy and Allie until a contested probable cause hearing could be completed. On November 30, 2009, after the eight-day probable cause hearing, the superior court issued findings and an order for temporary custody through March 26, 2010, the date originally scheduled for the adjudication trial. The superior court found probable cause to believe that "there is a substantial risk that [Allie] will suffer sexual abuse in the conditions that exist in the parents' homes," based on Allie's "disclosure that she engaged in 'hugging and kissing' with an older brother while watching pornographic movies alone with him in his room" and "the parents' insistence that the children maintain secrecy about anything that occurs in the home." The superior court also found probable cause to believe that "[Andy] has suffered mental injury as a consequence of being raised in an unhealthy home full of rage and conflict."

In April 2010 the parties rescheduled the adjudication and disposition trial and stipulated that OCS would retain custody of the children until the trial. On May 25, 2010, the superior court again postponed the adjudication and disposition trial at William's request and issued an order extending OCS custody of the children through the date of the trial.

The 15–day adjudication and disposition hearing occurred in August and September 2010. William repeatedly interrupted the proceedings by yelling obscenities at the witnesses, storming out of the courtroom, and talking on his cell phone. He also expressed his disregard for the proceedings by reading a novel. On October 4, 2010, the superior court issued oral findings that Andy was a child in need of aid under AS 47.10.011(4), (8), (9), and (11) and that Allie was a child in need of aid under AS 47.10.011(6), (7), (8), (9), and (11). On October 5, 2010, the superior court issued a written order memorializing its oral findings that Andy and Allie were children in need of aid and authorizing their continued placement outside the home for a period not to exceed 18 months, until April 2012.

Martha and William challenge several evidentiary rulings by the superior court. They challenge the admission of Dr. van Doorninck's expert testimony because he is not licensed to practice in Alaska, the admission of Cynthia Bridgman's hearsay testimony regarding Allie's statements to her under Alaska Evidence Rule 803(4) as statements for the purposes of medical diagnosis or treatment, and the admission of OCS permanency supervisor Judith Ringstad's testimony admitted under Alaska Evidence Rule 803(1) as a present sense impression. Martha and William also appeal the adjudication of Andy and Allie as children in need of aid under multiple subsections of AS 47.10.011. They argue that the superior court erred in finding that OCS made active efforts to prevent the breakup of the Indian family. Finally, Martha and William contend the superior court erred in finding that returning the children to them was contrary to the children's best interests and was likely to cause them serious emotional or physical damage.

## III. STANDARD OF REVIEW

In a case involving the removal of children from their parents' custody, we review a superior court's findings of fact for clear error, including "the superior court's factual determination[ ] as to whether the State met its evidentiary burden in showing that the children are in need of aid."[3]

**3.** *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

"Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[4] Conflicting evidence is ordinarily not enough to overturn a superior court's factual findings, and we "will not re-weigh evidence when the record provides clear support for the trial court's ruling."[5] We give "particular deference" to the superior court's factual findings when "they are based primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[6] Whether the superior court's factual findings comport with the requirements of the Indian Child Welfare Act and Alaska's Child in Need of Aid statutes are questions of law that we review de novo.[7] "Whether the State has complied with ICWA's 'active efforts' requirement presents a mixed question of law and fact."[8]

■ "We review a trial court's decision to admit or exclude evidence, including expert witness testimony, for abuse of discretion and will only reverse an erroneous decision if it affected the substantial rights of a party."[9] "An abuse of discretion exists only when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[10]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion In Its Evidentiary Rulings.

#### 1. The expert testimony from the psychologist licensed out of state was admissible.

■ Dr. van Doorninck is a psychologist from Colorado who was hired by OCS to evaluate the family. At the adjudication trial, Dr. van Doorninck was qualified as an expert without objection. William now argues that Dr. van Doorninck's testimony was inadmissible because Dr. van Doorninck is not licensed to practice psychology in Alaska.[11] William points to AS 08.86.170(a), which provides that, unless licensed, "a person may not use the title 'psychologist'," and AS 08.86.180(a), which provides that, unless licensed, "a person may not practice psychology or hold out publicly as a psychologist or as practicing psychology." William also relies on the statutory procedures in place to allow an out-of-state psychologist to obtain a license by credentials or a courtesy license.[12] William alleges that Dr. van Doorninck, even without a license, could have been a qualified expert witness if he testified only about general issues, but that he crossed the line into "practicing" psychology by evaluating and administering psychological tests to Martha, Allie, and Andy.

William's argument is without merit. Alaska Evidence Rule 702, governing the admissibility of expert testimony, has no li-

**4.** *Id.* at 269–70 (quoting *Dale H. v. State, Dep't of Health & Soc. Servs.*, 235 P.3d 203, 209–10 (Alaska 2010)).

**5.** *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008).

**6.** *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007).

**7.** *Neal M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 214 P.3d 284, 290 (Alaska 2009).

**8.** *Id.*

**9.** *Cartee v. Cartee*, 239 P.3d 707, 721 (Alaska 2010) (internal citations omitted).

**10.** *Schofield v. City of St. Paul*, 238 P.3d 603, 606 (Alaska 2010) (quoting *Getchell v. Lodge*, 65 P.3d 50, 53 (Alaska 2003)).

**11.** Although he did not object to Dr. van Doorninck's qualifications at trial, William claims that he relied on Dr. van Doorninck's statement that he did not need to be licensed and that he otherwise would have objected to his qualifications as an expert.

**12.** AS 08.86.150 (allowing for license by credentials rather than examination); 12 Alaska Administrative Code (AAC) 60.030 (2011) (describing application procedures for license by credentials); 12 AAC 60.035 (providing procedures for obtaining a courtesy license).

censing requirement; it only states that an expert witness can be qualified based on "knowledge, skill, experience, training, or education." And ICWA does not include any licensing requirement for "qualified expert witnesses" under 25 U.S.C. § 1912(e). We have already determined that expert witnesses need not be licensed in Alaska in order to testify here. In *Handley v. State,* a criminal defendant sought to admit expert testimony about alcoholic blackouts in support of his diminished capacity defense.[13] The trial court excluded the testimony after the State objected that the expert "was not qualified because he is not a clinical psychologist, qualified to be licensed under Alaska law" and "that he was not otherwise qualified, by virtue of his training and experience."[14] After reviewing the expert's qualifications, we reversed, holding that it was an abuse of discretion for the trial court to exclude the testimony and expressly concluding that "[t]here is no requirement that a witness possess a particular license or academic degree in order to qualify as an expert."[15] Here, William and Martha do not question Dr. van Doorninck's qualifications based on his knowledge, skill, experience, training, or education; they simply argue that he did not go through the proper procedures to become licensed in Alaska before evaluating the family. Dr. van Doorninck's lack of an Alaska license has no bearing on the admissibility of his expert testimony. The trial court did not abuse its discretion by allowing the testimony.

### 2. In CINA cases, statements made by a child to a therapist are admissible under Alaska Evidence Rule 803(4).

■ During the adjudication trial, Cynthia Bridgman testified about numerous statements made by Allie during her therapy sessions that related to alleged sexual experiences or exposure to sexual material. In recounting these statements, Bridgman clarified that her role was to provide treatment for Allie and that she was not conducting forensic interviews. The superior court concluded that the statements were admissible because they were made for the purposes of medical diagnosis or treatment under Evidence Rule 803(4). The superior court further explained that "[t]he circumstances and details are necessary to the treatment[,] including the identity of the perpetrator and the circumstances of the sexual contact and the nature of the sexual contact. [Allie] understands the purpose of therapy and g[ave] the statements understanding . . . th[at] context."

Martha and William challenge the superior court's decision to admit Bridgman's testimony, arguing that these were hearsay statements and that the superior court abused its discretion by allowing the statements to be admitted for the truth of the matter under the medical treatment exception. Martha and William also allege that Allie's statements should not have been admitted under Evidence Rule 803(4) because they were made over the course of many therapy sessions rather than for the purpose of an initial diagnosis. Finally, they argue that even if some of Allie's statements were admissible under Evidence Rule 803(4), "the scope of the exception" does not allow for "the identity of any assailant."

Evidence Rule 803(4) provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The commentary provides that the statements need not be made only to a physician, suggesting "hospital attendants, ambulance drivers, or even members of the family" as acceptable substitutes.[16]

Here, statements made by Allie to Bridgman in her capacity as clinical social worker were properly considered under Evidence Rule 803(4). The commentary to the rule provides that the statements need not be made to a physician, and many other courts

---

**13.** 615 P.2d 627, 629 (Alaska 1980).

**14.** *Id.*

**15.** *Id.* at 630.

**16.** Commentary Alaska E.R. 803(4).

have applied this rule to mental health workers under rules similar to Evidence Rule 803(4).[17] As the Alabama court of appeals has explained, this hearsay exception applies where "the purpose of the child's counseling sessions ... [is] for treatment" rather than "designed primarily for an evaluation of the child for a custody recommendation."[18]

Alaska courts have only addressed the use of this hearsay exception to admit a child's allegations of abuse in the context of criminal cases. In *Sluka v. State*, the court of appeals held that a three-year-old child's statement to a physician identifying her physical abuser was inadmissible under the exception because it was not sufficiently related to diagnosis or treatment.[19] The court of appeals noted that other courts had reached different results and explained that a "major influence" on its decision was that the State had not shown that the child was unavailable as a witness or that the child "knew or understood that her statements identifying Sluka were important to her treatment."[20] But in *State v. Nollner*, the court of appeals held that another three-year-old child's statements identifying her assailant in the case of sexual abuse *were* admissible under this exception for the purpose of a grand jury proceeding.[21] The court of appeals observed that "[t]here is significant authority for the state's position that [the child's] statements were properly admitted as an exception to the hearsay rule, as statements made for

purposes of medical diagnosis or treatment."[22] The court further noted that in the two years since its decision in *Sluka*, the "body of authority" allowing "admission of statements concerning the identity of an assailant in a child abuse case" appeared "to be growing."[23]

We have allowed a child's out-of-court allegations of sexual abuse to be admitted under the residual hearsay exception when there are sufficient guarantees of trustworthiness.[24] In that context, we have observed that "[t]he out-of-court statements of a child in proceedings where abuse is alleged are often quite necessary to the administration of justice."[25] In *In re A.S.W.*, we also explained that in a CINA proceeding, the due process concerns regarding a child's out-of-court accusations of abuse are less troubling than in a criminal case because the purpose of the hearing is not punitive and a judge, not jury, is making determinations:

> Child in Need of Aid ("CINA") proceedings are designed to protect children from injury or mistreatment and to help safeguard their physical, mental and emotional well-being. These confidential proceedings are not concerned with imposing either criminal penalties or civil liability on the alleged abuser. The focus of a CINA proceeding is not whether conduct constituting child abuse occurred, but whether the child's well-being is imperiled.

---

**17.** *See, e.g., M.B. v. R.P.*, 3 So.3d 237, 247–48 (Ala.Civ.App.2008); *Cabinet for Health & Family Servs. v. A.G.G.*, 190 S.W.3d 338, 343–44 (Ky. 2006); *In re O.A.W.*, 335 Mont. 304, 153 P.3d 6, 13–14 (2007); *In re J.D.H.*, 130 P.3d 245, 248–50 (Okla.2006); *In re Jessica C.*, 690 A.2d 1357, 1363–64 (R.I.1997); *In re Dependency of M.P.*, 76 Wash.App. 87, 882 P.2d 1180, 1183–85 (1994).
 Federal courts have also allowed statements to mental health workers to be admitted under Federal Rule of Evidence 803(4), which is identical to Alaska's rule. *See, e.g., United States v. Kappell*, 418 F.3d 550, 556–57 (6th Cir.2005); *United States v. Yellow*, 18 F.3d 1438, 1442 (8th Cir. 1994).

**18.** *M.B.*, 3 So.3d at 248.

**19.** 717 P.2d 394, 399 (Alaska App.1986).

**20.** *Id.* n. 3. It is worth noting, however, that Evidence Rule 803(4) is a hearsay exception for which the declarant's availability is immaterial.

**21.** 749 P.2d 905, 908–09 (Alaska App.1988).

**22.** *Id.* at 908.

**23.** *Id.*

**24.** *See, e.g., In re A.S.W.*, 834 P.2d 801, 804 (Alaska 1992); *Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1218 (Alaska 1991).

**25.** *In re A.S.W.*, 834 P.2d at 804 (also noting that "[t]he unusually compelling need for children's hearsay statements in sex abuse cases is demonstrated primarily by the fact that the statements often constitute the only proof of the crime. Physical corroboration is rare, for the crimes committed are predominantly nonviolent in nature." (quoting Judy Yun, Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases*, 83 COLUM. L.REV. 1745, 1749–50 (1983))).

In addition, CINA proceedings are tried before a judge, not a jury. While, in a jury trial, the admission of improper evidence may pose a threat to the accuracy of the outcome, in a CINA proceeding, the judge is more capable of attributing the proper weight to the evidence presented by the parties.[26]

We conclude that the superior court did not abuse its discretion by admitting Allie's statements to Bridgman, including the statements identifying her brothers as potential assailants, under Evidence Rule 803(4). The court of appeals has recognized that a child's statements identifying an assailant in the case of potential sex abuse can be made for the purposes of treatment, and we have admitted similar statements under the residual exception in other CINA proceedings. In this particular case, Bridgman testified that her sessions with Allie were for the purpose of treatment and that she was not acting as a forensic investigator, and the superior court expressly found that Allie understood the purpose of her sessions with Bridgman. The superior court did not abuse its discretion in admitting Bridgman's testimony under Evidence Rule 803(4).

### 3. We do not need to address the admissibility of Judith's Ringstad's testimony.

█ William argues that it was an abuse of discretion for the superior court to admit testimony from Judith Ringstad, an OCS permanency supervisor, describing statements made to her by Sara Alden, an OCS staff manager. Alden was the manager on duty during an incident where William came to the OCS offices and yelled and spit at OCS staff. OCS called the police, and William was escorted from the premises and subsequently banned from the OCS offices. Alden related this incident to Ringstad, the supervisor for the family's case, approximately 30 minutes after it happened. The superior court admitted Ringstad's testimony

under Alaska Evidence Rule 803(1), which provides a hearsay exception for present sense impression: "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." We do not need to reach the question whether Alden's statement made 30 minutes after the event falls within the present sense impression exception. Any error in admitting these statements was harmless because the record contains many examples of William cursing at and threatening OCS workers, including William's conviction for misdemeanor fourth degree assault. Moreover, William conceded that he feels "defiant" toward OCS. William stated that he was at "war" with OCS for the "past 14 years" and acknowledged that he had threatened to kill caseworkers who came to his home. Thus any error in admitting Ringstad's statements was harmless.[27]

### 4. The superior court did not improperly rely on previous CINA cases or Department of Juvenile Justice files involving Martha and William's other children.

William also argues that it was error for the superior court to take judicial notice of a previous CINA case involving the family as well as the juvenile delinquency records of Willie and Aaron. The superior court's adjudication order states that its findings are "[b]ased on the evidence received at the [adjudication] hearing, the court's previous findings in this case, and the court's records in this case." In the superior court's previous written findings on probable cause, the superior court said that it was "taking notice of the findings entered by Judge Hopwood" in the 2004 CINA case. But the superior court explained that it was taking notice of that file because the file was supported by testimony given in the present case. The probable cause finding also refers to the guardian ad litem's exhibits, which included Willie's and Aaron's juvenile delinquency records, but the

---

**26.** *Id.* at 806 (internal citations omitted).

**27.** *See Dobos v. Ingersoll,* 9 P.3d 1020, 1024–25 (Alaska 2000) (declining to reach the issue of whether the admission of testimony was proper under Rule 803(1), the present sense impression

exception to hearsay, because any error would be harmless since there was substantial evidence to support the finding of negligence and the testimony offered contributed only a "small role").

superior court expressly recognized that those exhibits were "subject to certain objections" made by Martha and William. Given that the juvenile records were supported by live testimony, the superior court did not err in considering findings from previous cases or juvenile justice files.[28]

### B. The Superior Court Did Not Err In Finding That Andy And Allie Are Children In Need Of Aid.

Martha and William appeal the adjudication of Andy and Allie as children in need of aid and the disposition order placing the children in the custody of OCS. In order to grant an adjudication petition the superior court must find by a preponderance of the evidence that the child is in need of aid under one or more subsections of AS 47.10.011.[29] The superior court must also conclude that OCS has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family but that those efforts have proved unsuccessful.[30] If a child is an Indian child, the superior court must find by clear and convincing evidence, including the testimony of qualified expert witnesses, that continued custody by the parent is likely to result in serious emotional or physical damage to the child.[31]

■■■ The superior court found Andy and Allie to be children in need of aid under multiple subsections of AS 47.10.011. But only one statutory basis is required to find that a child is in need of aid.[32] Additionally, at the State's request, the superior court

made its adjudication findings under the higher clear and convincing evidence standard, although only the preponderance of the evidence standard was required. While the superior court chose to make findings based on a clear and convincing standard, we review them under the preponderance standard.[33] Under the preponderance standard, the superior court did not err in adjudicating Andy and Allie as children in need of aid.

Martha and William challenge the superior court's findings that Andy and Allie are children in need of aid under AS 47.10.011, subsections (4), (6), (7), (8), (9) and (11). While some of the findings are primarily based on conduct by or conditions created by William, the superior court expressly found that Martha had aligned herself with William and had not been "able to separate herself from [William's] agenda and ideology and conduct," concluding that "her outcome will be tied to [William's] outcome until that stops." The record supports the trial court's assessment that Martha has shown an inability to separate herself from William's agenda against OCS and that she has failed to protect her children from William's abusive behavior and conditions. When OCS took custody of Andy and Allie, despite being told by OCS members not to contact William because he had previously threatened OCS members, she did so anyway. According to Dr. van Doorninck, Martha's relationship with the children is focused on facilitating her own needs. She has realigned herself with William by reconciling after a brief period of separation, and has expressed no desire to separate herself from William's actions. Until she has done

---

**28.** Trial courts often correctly rely upon a family's history with OCS to make findings. *See Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 679 n. 35 (Alaska 2008) ("the determination of whether OCS made reasonable efforts may involve consideration of all interactions between the parent and OCS"); *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003) ("the reasonableness of the division's efforts ... must be viewed in light of the entire history of services"); *see also Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1006 (Alaska 2011) (upholding an adjudication of children as in need of aid based in part upon OCS's "prior contact with the family").

**29.** AS 47.10.011; CINA Rule 15(c). At the State's request, in this case the superior court made its adjudication findings under the higher clear and convincing evidence standard.

**30.** 25 U.S.C. § 1912(d) (2006); CINA Rule 17(c).

**31.** 25 U.S.C. § 1912(e) (2006); CINA Rule 17(d)(2).

**32.** *Jon S. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 212 P.3d 756, 762 (Alaska 2009).

**33.** To support a clear and convincing standard, the superior court would have to make more extensive findings.

so, William and Martha's conduct are properly evaluated together.[34]

## 1. The superior court did not err in finding that Andy and Allie are children in need of aid under AS 47.10.011(8).

■ The superior court found that both Andy and Allie are children in need of aid under AS 47.10.011(8), which provides that a child is in need of aid if conduct or conditions created by the parent have resulted in mental injury to the child or have placed the child at substantial risk of mental injury. The superior court explained that Andy's mental health diagnoses and Allie's sexual reactivity "are the sort of mental injur[ies] that would qualify them for findings under that subpart." The superior court further found that "these injuries are the product of the parents' household and, with regard to [Andy], the product of the father's behavior." The superior court concluded that "[w]ith regard to both [Andy] and [Allie], there's a pattern of ignoring and isolating and corrupting behaviors that would, if continued, result in even further mental injury."

Alaska Statute 47.17.290(2) requires that mental injury be "evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner" and supported by the testimony of a qualified expert witness. There is substantial evidence that Andy suffered mental injury. Andy's treatment teams at North Star and RDT, as well as Dr. van Doorninck and Dr. Parker, agreed that Andy's primary diagnosis was likely PTSD, and the superior court also heard testimony from Dr. van Doorninck that PTSD need not be caused by a single-event trauma but can be the result of exposure to multiple psychological traumas during childhood.

Martha and William contend that there was no evidence of a specific trauma that could have caused Andy's diagnosis of PTSD and point to testimony that Andy's diagnoses of ADHD and oppositional defiant disorder could have a genetic component. But numerous experts, including Dr. Parker, the psychologist hired by William, testified that William's history of death threats, bullying, and intimidation in front of his children, combined with William's insistence on isolating the family from any social services, placed the children at risk. Dr. Parker noted that William continued to believe that threats to kill people were justified and concluded that William suffered from "major depressive disorder, mild to moderate," and "personality disorder, severe, with paranoid features." Dr. Parker further warned that it would be "difficult for [William] to change his behavior" and that this mental condition could continue to place the children at risk. Dr. van Doorninck testified that Martha was "unable to protect her children" and that both Martha and William have shown they are unwilling to modify their behavior. They have repeatedly expressed that they do not want to participate in OCS case plans or services other than visitation. William testified that he would not allow OCS home visits or even allow OCS to check on Andy at school. Martha has refused parenting classes. Given Andy's sustained mental injuries, William's continued abusive behavior, and Martha's inability to protect Andy, the superior court did not err in finding that by a preponderance of evidence Andy is a child in need of aid under AS 47.10.011(8).

Similarly, the superior court concluded that Allie was subjected to the same unstable conditions as Andy and placement in "the parents' household" would put her in a dangerous environment that would "result in even further mental injury." Bridgman did recognize that Allie did not have a substantial impairment in her ability to function, and Dr. van Doorninck similarly testified that Allie was mature, bright, and socially skilled for her age. But there was adequate evidence to support the superior court's finding that William's terrorizing and isolating behavior placed Allie at substantial risk. And according to Bridgman, Allie displayed sexual reactivity. Regardless of the origin of Allie's sexual reactivity, Dr. van Doorninck testified that Allie is at substantial risk of

---

**34.** *See Wilson W. v. State, Office of Children's Servs.,* 185 P.3d 94, 99 (Alaska 2008) (accepting a superior court finding that the conditions created by father's abusive behavior can be imputed to the mother when she fails to act to protect the children).

being sexually abused and that Martha lacked the skills to protect her from that abuse. The record supports the finding of a preponderance of evidence that Allie currently displays mental injury as evidenced by her sexual reactivity and is at risk of suffering future mental injury as a consequence of inadequate supervision and a hostile home environment. The superior court did not err in finding that Allie is a child in need of aid under AS 47.10.011(8).

**2. The superior court did not err in finding that Andy and Allie are children in need of aid under AS 47.10.011(11).**

 The superior court also found that both Andy and Allie are children in need of aid under AS 47.10.011(11), which provides that a child is in need of aid if the parent "has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury." The superior court explained that William has a personality disorder and has displayed behavior that "is terrorizing and traumatic." The children have been exposed to William's verbal assaults on school officials and OCS workers, as well as his physical assaults on other members of the household, placing them at risk of mental injury.

Dr. Parker diagnosed William with a "personality disorder, severe, with paranoid features" and predicted that this disorder would make it difficult for William to change his behavior toward OCS and other authorities. Dr. Parker also described William as displaying "intimidating, controlling and at times paranoid behavior." William does not dispute this diagnosis but argues that a personality disorder "is not a mental illness" under AS 47.10.011(11). The statute, however, uses the broader language of "mental illness, serious emotional disturbance, or mental deficiency," and the superior court heard expert

testimony from Dr. van Doorninck that this language encompasses William's personality disorder. It was not error for the superior court to find that William's personality disorder placed both children at substantial risk of mental injury for the reasons discussed in the previous section.[35]

**C. The Superior Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Family.**

 Martha and William argue that OCS failed to make active efforts under ICWA to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. The superior court found that active efforts had been made; OCS offered services—including parenting classes, parenting coaches, and mental health assessments—even though Martha and William consistently refused to cooperate. The superior court also found that OCS had provided visitation and mental health treatment services to Allie and Andy.

Martha and William's longstanding refusal to cooperate with OCS and William's verbally abusive and threatening behavior toward OCS staff made it difficult for OCS to provide services to the family. We have held that "a parent's demonstrated lack of willingness to participate … may be considered in determining whether the State has taken active efforts,"[36] and we have "excused OCS from pursuing further active efforts in … cases where the parents have evinced no interest in cooperating with OCS."[37] In this case, there is no doubt that Martha and William have refused to cooperate. William described himself as "defiant" toward and "at war" with OCS and admitted that he instructs his children not to cooperate with OCS. William refused to participate in some OCS meetings and in the evaluation with Dr. van Doorninck. Martha and William re-

---

**35.** The superior court also found that Andy was a child in need of aid under AS 47.10.011(4) and (9), and Allie was a child in need of aid under AS 47.10.011(6), (7), and (9). Given that only one finding is necessary to find that a child is in need of aid under AS 47.10.011, we need not examine whether Andy and Allie are children in need of aid under these additional subsections.

**36.** *N.A. v. State, Div. of Family & Youth Servs.,* 19 P.3d 597, 603 (Alaska 2001).

**37.** *Wilson W.,* 185 P.3d at 101.

peatedly expressed that they did not want to participate in any services other than visitation. And William testified that if the children were returned home, he would not allow OCS to conduct home visits. William also has a long history of verbally abusing and threatening violence toward OCS caseworkers.[38] Given the magnitude of the parents' resistance, it was not error for the superior court to find that active efforts had been made.

### D. The Superior Court Did Not Err In Finding That Returning The Children To Their Parents' Custody Was Contrary To The Children's Welfare And Was Likely To Cause Them Serious Emotional Or Physical Damage.

Finally, Martha and William argue that it was clearly erroneous for the superior court to find that returning Andy and Allie to their parents' custody would be contrary to their welfare and was likely to cause them serious emotional or physical damage. The superior court found that "[t]he critical component with regard to both [Andy]'s mental needs and [Allie]'s mental needs is treatment[ ] and professional intervention, yet the parents are unable and unwilling to work with professionals to get that treatment." The superior court further observed that Martha and William had expressly stated that they remained unwilling to cooperate with OCS.

Martha and William focus on Dr. Parker's testimony that Andy was likely to suffer greater harm from being removed from his family than from William's behavior, and on Martha's testimony that she would protect Allie from any risk of sexual abuse.

There was sufficient testimony from qualified expert witnesses, as required by ICWA, to support the superior court's finding. William's psychologist, Dr. Parker, agreed that if Andy were placed back in his parents' home without proper treatment he would be at high risk for suicide or other dangerous behavior. Dr. van Doorninck testified that Andy was "insufficiently stable to return to a home setting" and recommended that he spend "an extended period of time in residential treatment." Chris Yinkey, Andy's therapist at North Star, also recommended that Andy return to a long-term residential treatment program after being stabilized at North Star and cautioned that Andy would be at high risk for aggression and suicide attempts without continued treatment.

Dr. van Doorninck also recommended that Allie remain outside the home and receive "an extended period of time in psychological treatment," along with twice-weekly visits with her parents. Dr. van Doorninck cautioned that Allie's "vulnerability to being sexualized and, frankly, sexually abused is a—is a real danger." And although Cynthia Bridgman thought that Allie had made good progress and did not have a substantial impairment in her ability to function, she emphasized that Allie's ability to return home depended on her parents' ability to keep her safe. Despite Martha's testimony that she would protect Allie, the superior court also heard testimony from Martha and William that they remained unwilling to cooperate with OCS and would not allow OCS caseworkers to check on the children at home or in school. Dr. van Doorninck expressly found that Martha lacked the ability to "protect her children from physical, sexual, and psychological abuse." There was sufficient

---

38. Martha and William make some valid complaints about restrictions imposed by OCS on their ability to contact their children and participate in their treatment. For example, OCS took Andy and Allie into custody on October 23, 2009. Andy was immediately transported to an emergency room in Fairbanks and then to North Star psychiatric facility in Anchorage without being able to talk to his parents. At the probable cause hearing in mid-November, Andy's therapist testified that OCS would not allow Andy to have any contact with his parents.

By resisting or limiting visitation and preventing the parents from being involved with the children's treatment, OCS may have further entrenched Martha and William's hostile attitude toward OCS. But the superior court also found that, entirely apart from his interactions with OCS, William's conduct created a hostile home environment for the children. As we have noted, "the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence." *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007).

evidence to support the superior court's finding that it was contrary to the best interests of Andy and Allie to return home.

## V. CONCLUSION

We AFFIRM the superior court's evidentiary rulings with regard to the admissibility of Dr. van Doorninck's expert testimony and Cynthia Bridgman's testimony, and its reliance on the prior adjudications of William and Martha's older children. We decline to reach the issue whether Judith Ringstad's testimony was admissible, since any error would be harmless. We AFFIRM the superior court's decision to adjudicate Andy and Allie as children in need of aid.