NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| WILLIAM S. (Father), ) | |
| ) | Supreme Court Nos. S-14928/14930/14943 |
| Appellant, ) | (Consolidated) |
| ) | |
| v. ) | Superior Court Nos. 4FA-09-00116 CN |
| ) | and 4FA-09-00117 CN |
| STATE OF ALASKA, ) | |
| DEPARTMENT OF HEALTH & ) | MEMORANDUM OPINION |
| SOCIAL SERVICES, OFFICE OF ) | AND JUDGMENT* |
| CHILDREN'S SERVICES, ) | |
| ) | No. 1474 - January 15, 2014 |
| Appellee. ) | |
| ) | |
| MARTHA S. (Mother), ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| STATE OF ALASKA, ) | |
| DEPARTMENT OF HEALTH & ) | |
| SOCIAL SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, ) | |
| ) | |
| Appellee. ) | |

---

\*      Entered under Appellate Rule 214.

ANDY S. (Minor), )
)
              Appellant, )
)
      v. )
)
STATE OF ALASKA, )
DEPARTMENT OF HEALTH & )
SOCIAL SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
)
              Appellee. )

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant William S. Christi A. Pavia, Pavia Law Office LLC, Anchorage, for Appellant Martha S. Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Andy S. David T. Jones, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

## I.    INTRODUCTION

William and Martha S. appeal the termination of their parental rights to their two youngest children, Andy and Allie,[1] who at the time of the termination trial were 12 and 8 years old respectively. On an earlier appeal we affirmed the superior court's finding that Andy and Allie were children in need of aid (the CINA

---

[1]    We use pseudonyms to protect the privacy of the parties.

adjudication).[2] On this second appeal the parents argue that the superior court erred in finding (1) that the children were in need of aid under the heightened standard of proof applied in termination proceedings; (2) that the Office of Children's Services (OCS) made active efforts to prevent the breakup of their family; and (3) that the children were likely to suffer serious emotional or physical harm if returned to the parents' custody. They also contest the superior court's finding that termination was in the children's best interests. Andy also appeals the termination of parental rights, raising several of the same issues his parents do and arguing in addition that the superior court violated his due process rights by disregarding his own preference that he be returned to his parents. We find no error in the superior court's decision, however, and affirm it.

## II. FACTS AND PROCEEDINGS

### A. Facts And Proceedings Through The CINA Adjudication

William and Martha S. have six children. Only Andy and Allie are minors; they are Indian children as defined in the Indian Child Welfare Act (ICWA).[3] The family has a long history of contact with OCS and its predecessor, the Division of Family and Youth Services; William described himself as having been "at war" with OCS for many years.[4] OCS's first contacts with the family were in the early 1990s; in 2005 the two oldest children, Rachael and Willie, were adjudicated children in need of aid but were left in their parents' home.[5] The predisposition report in this case chronicles numerous reports of suspected child abuse or neglect beginning in 1991.

---

[2] *Martha S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 268 P.3d 1066 (Alaska 2012).

[3] *See* 25 U.S.C. § 1903(4) (2006) (defining Indian child).

[4] *Martha S.*, 268 P.3d at 1068-69.

[5] *Id.* at 1068.

In October 2009 Andy made several attempts to choke himself at school, and OCS, following up on a report of harm, picked up Allie and Andy from Martha's home on October 23, 2009, and took them to a child advocacy center for interviews.[6] Martha called William to tell him what was happening, even though OCS had asked her not to; her phone call got the police involved due to William's history of bellicosity.[7] The children were interviewed; Andy did not want to talk about his attempts to hurt himself, but Allie told the interviewer that "she had a 'bad secret' with one of her brothers."[8] OCS decided to take both children into emergency custody.[9] Allie was placed in a foster home, and Andy was taken to the hospital emergency room for a mental health evaluation before being flown to North Star Hospital in Anchorage.[10]

Andy was later moved to the residential diagnostic and treatment unit (RDT) at Family-Centered Services of Alaska in Fairbanks.[11] Shortly before the CINA adjudication trial Andy was sent back to North Star "because of physical aggression, lack of impulse control, and harm toward others displayed at RDT."[12] At the adjudication trial, "OCS's expert psychologist Dr. William J. van Doorninck testified that RDT had

---

[6]    *Id.* at 1069-70. Martha and William were separated during these events, but they reconciled near the time of the adjudication trial.

[7]    *Id.*

[8]    *Id.*

[9]    *Id.*

[10]    *Id.*

[11]    *Id.* at 1070-71.

[12]    *Id.* at 1071.

been a 'treatment failure' for Andy and that RDT's model was not well-suited for him."[13] Andy was released from North Star and in the summer of 2010 was placed with Alaska Children's Services (ACS), a residential treatment center in Anchorage.

Also prior to the CINA adjudication trial, Allie reported to her counselor, Cynthia Bridgman, that she had watched "sex movies" with her older brother Aaron and also that Andy had engaged in sexual activity with her.[14] These reports, and Allie's sexualized behavior with another foster child, raised concerns about Allie's "sexual reactivity," a condition Bridgman explained as "when a child has a sexual experience whether it be exposure or personal experience and then they act on it [and] try to re-engage or engage in that . . . behavior."[15]

The CINA adjudication trial was long, and William "repeatedly interrupted the proceedings by yelling obscenities at the witnesses, storming out of the courtroom, and talking on his cell phone."[16] At the close of trial the superior court made findings related to several subsections of AS 47.10.011 and decided that Allie and Andy were children in need of aid.[17] We affirmed that decision based on AS 47.10.011(8), mental injury to a child, and AS 47.10.011(11), parental mental illness or emotional disturbance.[18]

---

[13]    *Id.*

[14]    *Id.* at 1071-72

[15]    *Id.* at 1071-72 (internal quotation marks omitted).

[16]    *Id.* at 1075.

[17]    *Id.*

[18]    *Id.* at 1081-82.

**B.    Post-adjudication Facts And Proceedings**

After OCS took custody of the children, their placement histories diverged due to the differences in their mental health and behavior. Allie was diagnosed with an adjustment disorder, which her counselor described as a "benign" diagnosis. Allie was in a stable foster home throughout the course of the proceedings; this home became a preadoptive placement. Andy, in contrast, lived in three different residential treatment centers with periodic hospitalizations. He has had several psychiatric diagnoses during these proceedings, including oppositional defiant disorder, attention deficit hyperactivity disorder (ADHD), and intermittent explosive disorder.

Andy had behavioral problems at ACS, and after another stay at North Star was placed at Colorado Boys Ranch due to the lack of suitable in-state placements. He did well at the Ranch; he had a good relationship with his counselor and earned good grades in school. Andy liked the structure, and when his parents visited they interacted well with the treatment providers there. OCS's expert psychologist, Dr. van Doorninck, testified that the Andy he interviewed before the termination trial in 2012 was "quite different than the [Andy he] saw two years prior." Andy had "made across-the-board improvement in the areas of concern." Andy still misbehaved at times, but the incidents were less aggressive. Still, Dr. van Doorninck and the staff at the Ranch did not think Andy was ready for placement in the community or a return to his parents.

Yolanda Easaw Thomas, the social worker assigned to the case from May 2010 until May 2012, testified at the termination trial that placement for Andy after his return from Colorado was problematic. Some treatment providers in Fairbanks, having heard reports about Andy's parents, refused to work with him unless parental rights were terminated. OCS identified a potential foster home in Fairbanks, and Andy had Skype sessions with the foster parent while he was in Colorado. But at a July 2012 hearing, OCS informed the court that the foster parent had not yet completed the training required

for a therapeutic foster home; and OCS worried that Andy would run away if he was in Fairbanks when the court issued a termination decision. Andy was therefore transferred to McCann, a residential treatment center in Bethel, in August 2012.

Allie was in a stable foster care placement during this time, continued to do well in school, and had regular sessions with Bridgman, her therapist. She told Bridgman about other sexual abuse in her home, saying she had sexual contact with another brother as well as with Andy.

Allie also had regular, supervised visits with her parents; according to Easaw Thomas, Martha acted appropriately when visiting with Allie and the two of them had good visits. Martha asked for increased visitation as well as unsupervised visitation, but she was unsuccessful in persuading the court that OCS's existing schedule was unreasonable.

When Andy was in Anchorage, his parents traveled there every other week to visit him. While he was in Colorado, his parents had Skype sessions and phone contact with him, and each traveled to Colorado to visit him, OCS paying for Martha's visit, which according to Andy's counselor "went extremely well." There were also two in-person visits between Andy and Allie after the CINA adjudication trial. Easaw Thomas, observing these visits, was concerned that the siblings' interactions were inappropriately sexualized; she testified that she sometimes felt as though she was supervising "teenagers out on a date."

OCS developed several case plans for the parents over the course of the proceedings. Martha's case plans required her to participate in visitation, to get counseling (the nature of which varied somewhat in different plans), to work with a parenting coach, and to demonstrate the parenting skills she learned. William's case plan had similar requirements, as well as substance abuse education to address his marijuana

use.  But neither parent did much to comply with those parts of their plans requiring behavioral changes.

Martha had undergone several psychological evaluations before the CINA adjudication:  one with Dr. Siegfried Fink, who recommended dialectical behavior therapy, and one with Dr. van Doorninck, who recommended "[a] court-ordered treatment plan for each parent to address domestic violence and parenting skills" and also stated that "actual documented behavior changes" were needed before reunification could be considered.

Martha completed an intake with Fairbanks Community Behavioral Health Center in December 2010.  Her diagnosis was adjustment disorder, and the intake assessment recommended regular counseling as well as a psychiatric evaluation to see if she needed medication.  She did not get the psychiatric evaluation.  She did attend some individual counseling sessions in 2011 and participated in three or four joint counseling sessions with Allie and Bridgman.  At the termination trial, Martha testified that she had also received counseling from her pastor and had recently contacted a local agency for the recommended behavior therapy.  However, she did not consider parenting classes or other instruction to be necessary because she had been a parent for so long and because she didn't think parenting could be taught.  Easaw Thomas concluded that Martha had not tried hard enough or progressed in her therapy.

William participated in a psychological evaluation with Dr. Stephen Parker in March 2010, before the CINA adjudication trial.  Dr. Parker reported that William was remarkably "impervious . . . in his inability to understand other people's point of view." Dr. Parker diagnosed William with major depressive disorder, a history of polysubstance abuse, and a severe personality disorder with paranoid features; he also noted William's "[s]evere conflict with [OCS]" as a social stressor.  Dr. Parker recommended that William's visitation with Andy not be supervised by OCS because "a neutral supervising

party would reduce [William's] fears and allow for more genuine interaction." He also recommended that William continue in psychotherapy, participate in an alternatives to violence program, receive parenting education, and "[d]esist from intimidating and threatening behavior." William attended two counseling sessions at Fairbanks Community Behavioral Health Center but stopped going when his counselor stopped working there. He did not follow Dr. Parker's recommendations in any other way, rejecting the doctor's opinion that he had an antisocial personality disorder. He visited Allie at times but stopped several weeks before the termination trial. He did not participate in joint counseling sessions with her and Bridgman because of OCS's worries about his behavior.

OCS petitioned to terminate the parents' rights to both children in August 2011. The termination trial took place over 15 days in April and June 2012. Bridgman testified in detail about her sessions with Allie following the CINA adjudication trial, including the joint sessions with Martha. Bridgman described how she encouraged Allie to tell her mother about the sexual abuse allegations, but that the prospect of getting her brothers in trouble, and possibly subjected to physical punishment, caused Allie to "shut down verbally" and withdraw. Bridgman advised Martha how to engage with Allie in order to build her trust, but Martha failed to cooperate. Bridgman testified that she suspended joint sessions after that because she did not "think it was safe," in that they would only cause Allie more distress. She testified that as of November 2011, when she ended her therapeutic relationship with Allie, she believed there should be no further contact between Allie and her parents. She identified Allie's mental injury as sexual reactivity that "impedes her continuance of developmentally appropriateness [sic] from time to time," and she testified that while Allie's impairment might not be substantial any longer, it certainly had been when she began therapy.

Shawna Ragan, who took over as Allie's counselor when Bridgman moved away, also testified as an expert. She testified that Allie was "developing very well" and doing well in school. Asked whether it was in Allie's best interests to return to her family, Ragan answered that Allie "needs to be in a home with healthy boundaries and structure" and that Allie identified her foster home as safer than that of her parents. Ragan agreed that reunification was not likely if the parents were unwilling to change.

Ernie Vigil, Andy's counselor from Colorado Boys Ranch, also testified as an expert. He identified Andy's psychiatric diagnoses as including post-traumatic stress disorder, intermittent explosive disorder, and reactive attachment disorder. He described Andy's therapy at the Ranch and testified that Andy was doing well overall, albeit with occasional behavior issues. He described the positive visits between Andy and his parents, both in person and via Skype, but he also testified that William and Martha refused to acknowledge Andy's need for psychiatric care and blamed all of his problems on OCS. Vigil nonetheless thought that family therapy could be helpful, and he testified that the Ranch had recommended it.

Easaw Thomas testified about the efforts OCS had made to assist the family, including developing case plans, providing visitation, supervising the visits, offering reimbursement for visitation expenses, getting counseling for the children, and making referrals for the parents. According to Easaw Thomas, OCS did not think family therapy was appropriate because of the parents' unwillingness to consider change. Visitation remained supervised for the same reason: the parents saw no need to change their behaviors. Easaw Thomas testified about the parents' failure to follow through with the requirements of their case plans and psychological evaluations. She thought reunifying the family would place the children at risk of emotional abuse and expressed the opinion that it would be detrimental to return the children unless there was parental

change, which was unlikely. She testified that the plan for Allie was adoption by her foster family, but that the plan for Andy remained unclear.

Scott Hanauer, Andy's retained expert, testified that he was the clinical director of a private social service agency in Washington. He identified a number of barriers Andy faced in achieving permanency, including his age, his anger and destructive impulses, his family's resistance to accepting services, and concerns about institutionalization generally. He acknowledged that there were serious parenting problems in the family home. Asked about Allie, he testified that it would be risky to return her to her parents, and he agreed that OCS should continue with its adoption plans for Allie because she had bonded well with her foster family and had shown improvements there. As for Andy, Hanauer testified that it was a "hard call" whether it was in the boy's best interests to return to his parents' home but that ultimately reunification was the best option, because they all wanted it and because Andy had no viable placement alternative. Hanauer cautioned that for reunification to succeed, William and Martha would have to accept services intended to help them change their conduct and would have to recognize that they needed to make changes; in addition the parents would have to provide safe access to their home so that others could monitor the situation. Hanauer recognized that William's and Martha's relationship with OCS was antagonistic, but he felt that an outside agency could provide the type of bridge-building services he was describing.

Dr. van Doorninck, also testifying as an expert, described his follow-up evaluation of Andy. He noted Andy's progress at Colorado Boys Ranch, but he said that Andy was functioning at too low a level for a community placement and agreed that Andy needed therapeutic foster care. He did recognize some positive parental changes: William and Martha communicated well with treatment providers at the Ranch and acted civilly toward them. Still, in Dr. van Doorninck's opinion, Andy was not able to return

to his family because the family dysfunction continued — despite Andy's improvement, there was not enough improvement in the family.

Andy testified about his own preferences at a hearing with only his attorney, the guardian ad litem, the OCS social worker, and Vigil, the Ranch counselor, present. He told the court that he wanted to return home because he "really, really miss[ed his] family" and had not been home for over two years.

On September 12, 2012, the court issued an order terminating William's and Martha's parental rights to both Allie and Andy. The trial court found that the children were in need of aid under several statutory subsections. It found that the parents had not remedied the conduct or conditions that placed the children at risk of harm, that the children would suffer serious emotional and physical damage if they were returned to their parents' custody, that OCS had made active efforts to prevent the breakup of the family, and that termination of parental rights was in the children's best interests.

William and Martha both appeal the decision terminating their parental rights. They argue that the court erred in finding that (1) the children were in need of aid; (2) OCS made active efforts to prevent the breakup of the family; (3) the children would likely suffer serious harm if returned to their parents; and (4) termination was in the children's best interests. Andy appeals the termination of his parents' rights as to him, arguing that termination was not in his best interests and that the court denied him due process by disregarding his opinion.

## III. STANDARD OF REVIEW

The following issues are factual questions that are reviewed for clear error: whether a child is a child in need of aid,[19] whether the parents' continued custody will

---

[19]    *See Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 246 P.3d 916, 923 (Alaska 2011) (finding no clear error in trial court's decision
(continued...)

likely result in serious emotional damage,[20] whether the parents have remedied the conduct or conditions that put the children at risk,[21] and whether termination is in the children's best interests.[22] The question whether OCS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family is a mixed question of law and fact.[23] We review factual findings for clear error and conclusions of law de novo.[24] A finding is clearly erroneous if we are "left with a definite and firm conviction that a mistake has been made after a review of the entire record in the light most favorable to the party prevailing below."[25] We review constitutional issues de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[26]

---

[19](...continued)
that child was in need of aid due to abandonment).

[20]    *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010) (citing AS 47.10.088(a)(2)(B)).

[21]    *Id.* (citing AS 47.10.088(a)(2)(A)).

[22]    *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

[23]    *Id.* at 961 (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010)).

[24]    *Id.* (citations omitted).

[25]    *Lucy J.*, 244 P.3d at 1111 (citations and internal quotation marks omitted).

[26]    *Smart v. State, Dep't of Health & Soc. Servs.*, 237 P.3d 1010, 1014 (Alaska 2010) (quoting *Pepper v. Routh Crabtree, APC*, 219 P.3d 1017, 1020 (Alaska 2009)).

## IV. DISCUSSION

Before a trial court can terminate parental rights to an Indian child, it must make the following findings by clear and convincing evidence: (1) the child is in need of aid under AS 47.10.011;[27] (2) "the parent has not remedied the conduct or conditions in the home that place the child in substantial risk of harm" or has not remedied, within a reasonable period of time, "the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury";[28] and (3) OCS has made active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and . . . these efforts have proved unsuccessful."[29] The court must also "find by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[30] Last, the court must find by a preponderance of the evidence that terminating parental rights is in the child's best interests.[31]

---

[27] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009) (quoting AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A)).

[28] *Id.* at 761 (quoting AS 47.10.088(a)(2); CINA Rule 18(c)(a)(A)(i)) (internal quotation marks omitted).

[29] *Id.* (quoting 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B)) (internal quotation marks omitted).

[30] *Id.* (quoting 25 U.S.C. § 1912(f); CINA Rule 18(c)(4)) (internal quotation marks omitted).

[31] *Id.* (quoting CINA Rule 18(c)(3)).

**A.** **The Trial Court Did Not Err In Finding By Clear And Convincing Evidence That The Children Were Children In Need Of Aid.**

The trial court found that Andy was a child in need of aid under the following subsections of AS 47.10.011: (4) (failure to get medical treatment), (6) (physical harm), (8) (mental injury), (9) (neglect), and (11) (parental mental illness). The court found that Allie was a child in need of aid under subsections (4) (failure to get medical treatment), (7) (sexual abuse), (8) (mental injury), (9) (neglect), and (11) (parental mental illness).

"[O]nly one statutory basis is required to find that a child is in need of aid."[32] In the parents' appeal of the CINA adjudication order, we affirmed the finding that the children were in need of aid under subsections (8) (mental injury) and (11) (serious emotional disturbance of parent).[33] At the State's request, the trial court had made its findings applying the clear and convincing evidence standard, but we noted that only a preponderance of the evidence was required at the adjudication stage and applied that standard on review, cautioning, however, that "[t]o support a clear and convincing standard, the superior court would have to make more extensive findings."[34] The superior court made those more extensive findings following the termination trial. We hold that the trial court did not err when it found by clear and convincing evidence that

---

[32] *Martha S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 268 P.3d 1066, 1080 (Alaska 2012) (citing *Jon S.*, 212 P.3d at 762).

[33] *Id.* at 1081-82.

[34] *Id.* at 1080 & n.33. Clear and convincing evidence "is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994) (quoting *Castellano v. Bitkower*, 346 N.W.2d 249, 253 (Neb. 1984)) (internal quotation marks omitted).

Allie and Andy were children in need of aid under AS 47.10.011(8) and AS 47.10.011(11).

### 1. Parental conduct causing mental injury (AS 47.10.011(8))

Alaska Statute 47.10.011(8) provides that a child is in need of aid "if conduct or conditions created by the parent have resulted in mental injury to the child or have placed the child at substantial risk of mental injury."[35] A finding of substantial risk of mental injury under subsection (8)(B) requires a showing of one of three conditions: (1) "a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury;"[36] (2) exposure to certain crimes of domestic violence;[37] or (3) "repeated exposure" to other crimes of domestic violence.[38]

The trial court found by clear and convincing evidence that Andy and Allie had been "subject to conduct or conditions described in subsection (8)(A) & (B)(i)." It found that the children had "suffered mental injury" due to the parents' "lack of supervision," their "failure to meet [the children's] mental health and counseling needs," and "William's pattern of terrorizing, isolating, and violent behavior, including inappropriate and intimidating corporal punishment."

### a. Mental injury to Allie

The parents first dispute that Allie had a mental injury.[39] As we stated in *Martha S.*, mental injury must "be 'evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner'

---

[35] *Martha S.*, 268 P.3d at 1081.

[36] AS 47.10.011(8)(B)(i).

[37] AS 47.10.011(8)(B)(ii).

[38] AS 47.10.011(8)(B)(iii).

[39] Neither parent contests the finding that Andy had a mental injury, although William questions whether Andy's problems were caused by the parents.

and supported by the testimony of a qualified expert witness."[40] Martha contends that the trial court erred because Allie was happy and well-adjusted and did not show mental injury when she was taken into State custody; Martha argues that any "boundary issues" Allie had were the result of her foster home, where there was another child who had been sexually abused. William argues that nothing supports the finding that Allie had a substantial impairment.

Allie's diagnosis of an adjustment disorder did not change throughout the case. Bridgman testified that Allie's sexual reactivity "impedes her continuance of developmentally appropriateness [sic] from time to time." Although Bridgman equivocated as to whether this impairment, which was "substantial hands down" when she first met Allie, remained substantial at the time of the termination trial due to the "good progress" Allie had made, Bridgman did not agree that Allie's progress meant she could return home, stating that "[Allie's] parents are the ones that . . . would determine her risk" based on whether they had changed the home environment.

There is no indication in the record that William and Martha significantly modified the home environment in the years leading up to the termination trial. Bridgman's testimony supports the superior court's conclusion that Allie suffered mental injury at the time she was taken into custody, that she remained impaired, and that returning her to her home would result in mental injury.

### b.    Parental conduct or conditions

William and Martha also dispute that their conduct or the conditions in their household caused mental injury to Andy and Allie. William argues, as he did in the

---

[40]    268 P.3d at 1081.

CINA adjudication appeal,[41] that Andy's psychiatric problems are not the product of the family home but rather are genetically based. As noted above, Martha maintains that Allie's sexual reactivity was the result not of conditions in the family home but of incidents in the foster home where she was placed by OCS.

The trial court was persuaded that Allie's brothers had sexually abused her and that her parents were responsible due to a failure of supervision. The parents vigorously contest the sexual abuse finding, but even without that finding there was evidence that William isolated the family and engaged in terrorizing behavior that either caused mental injury or placed the children at risk of mental injury. The terrorizing behavior was directed at a minimum at social service providers and school officials, and it included threats to kill social workers; a criminal conviction stemming from his attempt to run over OCS staff in the courthouse parking lot; obscenities directed at those who disagreed with him, including the court; and admitting that he had once beaten Willie and would do so again. Allie's statements in therapy suggested that the children were beaten with a paddle, and there is some support for this in William's own statements during an evaluation.

William's threats against social workers were obviously distressing to Andy — he was frightened when he was first taken into custody because of his father's threats to hurt anyone who removed Andy from the home.[42] William's psychological evaluation revealed that he did not consider himself at all responsible for the turmoil in his household: when "[a]sked what he was doing to make this situation worse, [William] responded: 'Nothing at all.' " The evaluator noted that William "was unable to see how his volatile and threatening behavior might [a]ffect other people." The psychological

_____

[41]    *Id.* at 1081.

[42]    *Id.* at 1070.

evaluation also said, "The present road [William] is on suggest[s] that he is not capable of controlling his impulses to bully and intimidate people he believes are threatening his family." The psychologist reported that William needed to "get it through his head" that he needed "to behave in a more civil manner" for the sake of his children. But the record shows little if any change in William's behavior.

While William and Martha cooperated with the treatment providers at the Ranch, William displayed hostility and contempt toward the court and OCS throughout the proceedings. Easaw Thomas, an African-American, testified at the termination trial that William had asked that a white social worker be assigned to his case and called her an idiot several times, at least once in front of Allie. She testified that William had told Andy he didn't have to listen to treatment providers. During the trial William verbally abused Easaw Thomas, a program evaluator, and the judge, calling them liars, idiots, or both. The record amply supports the conclusion that William remained unable to grasp the need for cooperation and civility, even for the sake of his children's welfare.

The trial court's finding that "William's behavior has been a model for Andy's explosive, defiant, and aggressive behaviors" is also not clearly erroneous. Andy had a diagnosis of intermittent explosive disorder, and he destroyed property at at least one treatment facility and swore at and pushed staff members at another. Easaw Thomas saw a correlation between Andy's problem behaviors and having been told by his parents that he did not need to follow the rules. And even if there is some genetic component to Andy's problem behaviors, as William contends, the father's belligerent and disrespectful behaviors were models for the son to follow; there was evidence that William's other sons, Willie and Aaron, acted the same way.

William further contends that the trial court "simply made an assumption, unsupported by clear evidence" when it found that Andy "would likely become like his brothers and become involved in the criminal justice system." But Dr. van Doorninck

wrote in his 2010 evaluation that the fact that five of William's and Martha's six children had "major issues . . . implicates [William] especially for adverse parenting practices." The trial court did not, as William suggests, "link the brother[s'] behaviors to Andy's future conduct" — the court followed Dr. van Doorninck's reasoning in linking all the children's negative outcomes to William's abusive parenting.

In sum, there is ample evidence to support the trial court's finding by clear and convincing evidence that William engaged in isolating and terrorizing behavior, and that his behavior either caused mental injury to the children or placed the children at risk of mental injury. Martha's continued alliance with William supports a finding that her conduct also placed the children at risk; she is not able to protect them from mental or emotional abuse that she refuses to acknowledge.[43] The trial court did not clearly err in finding that the children suffered mental injury or were at risk of mental injury due to conduct of their parents or conditions in their home.

### 2. Parental mental illness or serious emotional disturbance (AS 47.10.011(11))

In the parents' earlier appeal we also affirmed the CINA adjudication under subsection (11),[44] which provides that a child is in need of aid if the parent "has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury." We held that the statutory language could encompass William's personality disorder.[45] The evidence from the adjudication trial that we identified to affirm that decision, together with William's

---

[43] *Martha S.*, 268 P.3d at 1080-81 (citing *Wilson W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 185 P.3d 94, 99 (Alaska 2008)).

[44] *Id.* at 1082.

[45] *Id.*

failure to change his behavior since that time, is sufficient to affirm the finding that the children were in need of aid because of parental mental illness under the standard of clear and convincing evidence. As set out above, William's severe personality disorder and belligerent behavior put the children at risk of mental and physical injury. There was likewise no change in Martha's alignment with William and her endorsement of his attitudes toward treatment providers, the court, and OCS. The trial court did not clearly err in finding that the children were in need of aid under AS 47.10.011(11).

> **B.** **The Trial Court Did Not Err In Finding That The Children Would Likely Suffer Serious Emotional Harm If Returned To The Parents' Custody.**

The parents argue that there was insufficient evidence that the children would suffer serious emotional harm if returned to them. But we find no clear error on this issue either.

With respect to Allie, Bridgman, testifying as an expert, said that returning her to her parents' home would likely cause her serious emotional or physical damage. Easaw Thomas, also testifying as an expert, agreed. The testimony of OCS's psychologist, Dr. van Doorninck, focused more on Andy, but he gave the opinion that the family remained "extremely dysfunctional" and that this would be detrimental to any child who lived there. Andy's expert, Hanauer, testified that OCS should continue with Allie's adoption because of her improvements in foster care coupled with the risk of returning her to the parents' home after her allegations that she had been sexually abused there.

With respect to Andy, Easaw Thomas testified that he would likely suffer physical or emotional harm if returned to his family. Dr. van Doorninck testified that returning Andy to his parents would harm him because of their failure to acknowledge his mental health problems and their contribution to those problems; and that the parents

had done too little to address their parenting issues. Dr. van Doorninck testified that while he saw improvement in Andy, he saw none in the parents.

In addition to the expert testimony, the trial court had the opportunity to observe William and to gauge firsthand his lack of insight into the effect his behavior had on others. We made note of William's disruptive behavior during the CINA trial in our decision affirming the CINA adjudication.[46] His courtroom behavior remained difficult during the termination phase of the case: he interrupted testimony, left the courtroom without warning, and directed obscene and other insulting language at the judge and other participants. Despite testimony and reports from experts regarding necessary behavioral changes, he insisted that no one had told him and Martha what they needed to do. As Easaw Thomas testified, the parents placed their children in a difficult situation: the children were "tasked to engage in services and go through different changes when their parents are saying that there's nothing that needs to change." Although there was evidence that Andy was very attached to his family, even Hanauer, Andy's own expert, thought a decision to return him to the home was a "hard call." We conclude that the trial court did not clearly err in finding that returning the children to the parents would likely cause the children serious emotional harm.

**C.      The Trial Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.**

The parents contend that OCS did not make reasonable or active efforts to prevent the breakup of their Indian family. But the superior court did not clearly err in finding otherwise. OCS developed case plans, although the parents did not sign them. It arranged visitation, provided supervision for visits, paid for Martha to visit Andy in Colorado, offered to reimburse the parents for some of their travel to Anchorage (and did

---

[46]      *Id.* at 1075.

reimburse them at least once), offered Martha counseling for her own experience as a victim of child sexual abuse, obtained counseling for both children, and made other referrals for counseling for Martha.

The parents argue that OCS failed to make active efforts specifically because it did not get sex offender treatment for Andy. But Easaw Thomas testified that OCS did not consider him a sex offender and there was therefore no need for that treatment. William also argues that OCS should have provided family therapy as recommended by Colorado Boys Ranch and others. But OCS took the position that family therapy would not be useful until the parents were willing to comply with their own case plans; OCS was also concerned because William gave Andy conflicting messages about his need to cooperate during treatment. While the Ranch was willing to try family therapy in spite of the parents' attitudes, OCS's different and ostensibly reasonable perspective does not undercut the trial court's finding that OCS's efforts were reasonable.

Martha also argues that OCS failed in its active-efforts mandate because it did not refer her to a counselor for the recommended dialectical behavior therapy until right before the termination trial. Easaw Thomas testified that few providers in Fairbanks offered such therapy, but that she identified two possibilities for Martha in early 2011. She testified that she did not introduce Martha to either therapist directly, apparently because Martha was already in counseling at Fairbanks Community Behavioral Health Center. But Martha stopped that counseling in June 2011; Martha testified that she then sought counseling with her pastor, but she did not convey this information to Easaw Thomas, believing that "it was none of her business." We cannot tell from the record where the fault ultimately lies for the failure to timely follow through with dialectical behavior therapy. But OCS's efforts do not have to be perfect and "must be evaluated in light of the circumstances of each particular case, including the parent's

actions or inaction."[47] Martha's commitment to counseling was sporadic by any measure, and one possible lapse on the part of OCS is not fatal to the court's active-efforts analysis here. The trial court did not clearly err in its finding on this issue.

**D. The Trial Court Did Not Clearly Err In Deciding That Termination Of The Parents' Rights Was In The Children's Best Interests.**

The parents argue that the trial court clearly erred in deciding that termination of their parental rights was in the children's best interests. Andy also argues that termination was not in his best interests, contending that he is strongly attached to his parents and that placement with them is a better option, even if they are unfit, than placement in a series of institutions. He also maintains that the court erred by disregarding his desire to return home.

Alaska Statute 47.10.088(b) lists factors for a court to consider when making a best-interests determination in a termination proceeding. These include the harm caused to the child, the likelihood that the child can be returned to the parents within a reasonable time, and the amount of effort by the parents to remedy the conduct or conditions in the home. "The factors are not exclusive, nor is consideration of each factor mandatory."[48]

The trial court found that Allie and Andy were entitled to permanency but that neither of them could be returned to their parents' home. As for Allie, the court found that she was in a stable placement and had done well in her foster home; termination would open the way for adoption. All of the experts who testified about her situation supported termination and adoption.

---

[47] *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008) (citing *Jeff A.C., Jr. v. State*, 117 P.3d 697, 707 (Alaska 2005)).

[48] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 966 (Alaska 2013).

As for Andy, the trial court observed that he had not had "the stable and satisfactory foster home placement" that his sister had, but it nonetheless found that termination was in his best interests because it would permit him to continue in treatment without his parents' "disruptive influence." The trial court acknowledged that removal would cause Andy harm, but it found that "leaving [Andy] in the care of his parents would cause [Andy] even greater harm." As the guardian ad litem indicated in closing argument at the termination trial, the problem for Andy was that there was not a good placement plan at the time. But in looking at the statutory factors, the court could reasonably conclude — and thus did not clearly err in finding — that termination of parental rights was in Andy's best interests. Andy was removed from the home after he had attempted several times to hurt himself in a short period of time. Even more than two years after the removal, Andy's parents refused to acknowledge that he had mental health problems that needed treatment; they instead blamed his problems on OCS. The parents had done little to change conditions in the home, and there was evidence that some of Andy's abrasive behavior was learned from his father. William's behavior was likely to continue because he saw nothing wrong with it, and the family had a long history of dysfunction and intervention by OCS and the court. All of those factors weighed in favor of termination.

Andy's expert recommended against terminating his parents' rights, but he also testified that the parents had to make changes for Andy's placement in their home to be successful and they had to allow people into their home for monitoring purposes. The trial court could reasonably conclude, given the family's history with the court and William's behavior during the course of proceedings, that those necessary changes were unlikely. We hold that despite Andy's strong desire to return home and the lack of a permanent placement for him, the trial court did not clearly err in finding that termination of his parents' rights was in Andy's best interests.

**E.    The Trial Court Did Not Deny Andy Due Process.**

Finally, Andy argues that the court violated his due process rights by finding that he "[was] not of sufficient age or capacity to express a reliable preference." He cites procedural due process cases to support his argument, and he argues that the balancing test in *Mathews v. Eldridge*[49] required not only the appointment of counsel (which was done) but also some substantive consideration of his opinion.

We conclude that there was no denial of due process. The court afforded Andy procedural due process by appointing him separate counsel to advocate for his position that his best interests would be served by returning him to his parents' home. And we do not agree that the court disregarded Andy's position; the court's decision shows that it carefully considered Andy's testimony but concluded that it should not be given significant weight because Andy was "not of sufficient age or capacity to express a reliable preference." These findings have support in the expert testimony of Dr. van Doorninck, who believed that Andy was immature and failed to appreciate the consequences of his choice.

## V.    CONCLUSION

We AFFIRM the superior court's decision terminating Martha's and William's parental rights to Andy and Allie.

---

[49]    424 U.S. 319, 334-35 (1976).